No. 25-40464

United States Court of Appeals
for the Fifth Circuit

_____

GUILLERMO SAN MIGUEL MARTINEZ, INDIVIDUALLY AND AS REPRESENTATIVE
OF THE ESTATE OF GUILLERMO SAN MIGUEL SANCHEZ; MAURA SANCHEZ,
INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF GUILLERMO SAN
MIGUEL SANCHEZ; ELSA M. CORONADO; MAGDALENA CONDE; ZENAIDA
SANCHEZ; CECILIA TUSING; MIRTA SAN MIGUEL; ALEJANDRO SAN MIGUEL;
MAURO SAN MIGUEL,
*Plaintiffs—Appellants*

V.

HIDALGO COUNTY; BRIAN AYALA, INDIVIDUALLY AND IN HIS CAPACITY AS A
SHERIFF'S DEPUTY FOR HIDALGO COUNTY; JUAN FLORES, INDIVIDUALLY AND
IN HIS CAPACITY AS A SHERIFF'S DEPUTY FOR HIDALGO COUNTY,
*Defendants—Appellees*

_____

On Appeal from the United States District Court
for the Southern District of Texas

_____

## APPELLEES' BRIEF

_____

Ricardo Pumarejo Jr.
PUMAREJO LAW
1606 W. 42nd St.
Austin, TX 78756
p. 512.731.7869
ricardo@pumarejolaw.com

*Counsel for Appellees*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed person and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Plaintiffs/Appellants, affiliated entities and persons, and counsel:

- Plaintiffs/Appellants Guillermo San Miguel Martinez, Individually and as Representative of the Estate of Guillermo San Miguel Sanchez; Maura Sanchez, Individually and as Representative of the Estate of Guillermo San Miguel Sanchez; Elsa M. Coronado; Magdalena Conde; Zenaida Sanchez; Cecilia Tusing; Mirta San Miguel; Alejandro San Miguel; and Mauro San Miguel

- Attorneys Katie P. Klein and William D. Mount Jr. of Dale & Klein, LLP

- Attorney Raul Guajardo of Law Office of Raul A. Guajardo.

Defendants/Appellees, affiliated entities and persons, and counsel:

- Defendants/Appellees Hidalgo County, Texas; Brian Ayala; and Juan Flores

- Attorney Preston E. Henrichson of Henrichson Law PLLC.

- Attorney Michael A. McGurk of Walsh McGurk Cordova Nixon, PLLC

- Attorney Marissa Anna Carranza Hernandez of Marissa Anna Carranza Hernandez, Attorney at Law, PLLC

- Attorney Ricardo Pumarejo Jr. of Pumarejo Law.

/s/ **Ricardo Pumarejo Jr.**

Ricardo Pumarejo Jr.
*Counsel for Appellees*

2

## STATEMENT REGARDING ORAL ARGUMENT

Appellees request oral argument because the appeal presents multiple issues arising from a single fast-moving encounter, including warrantless entry, probable cause, exigent circumstances, excessive force, qualified immunity, municipal liability, the Texas Tort Claims Act, and Rule 59(e). Oral argument would aid the Court by allowing counsel to address the interaction among those issues and answer any questions about the summary-judgment record and the alternative grounds supporting affirmance.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................2

STATEMENT REGARDING ORAL ARGUMENT ..............................................3

TABLE OF AUTHORITIES............................................................................6

STATEMENT OF ISSUES PRESENTED............................................................8

STATEMENT OF THE CASE........................................................................10

    I.    Plaintiffs' live pleading and removal to federal court. ...........................10

    II.   The district court granted summary judgment on all claims asserted and entered final judgment...........................................................11

    III.  The district court denied Rule 59(e) relief, substituted Maura Sanchez's heirs, and Appellants perfected this appeal............................12

SUMMARY OF THE ARGUMENT ................................................................14

ARGUMENT .............................................................................................16

    I.    The district court correctly granted summary judgment on Appellants' unlawful-entry and unlawful-arrest claims because the Deputies did not violate the Fourth Amendment and, in any event, are entitled to qualified immunity...........................16

        A.    The Deputies' entry was lawful because Maura Sanchez had authority to consent and did consent. .....................................16

        B.    The Deputies had probable cause to arrest Guillermo for assault involving family violence........................................20

        C.    Exigent circumstances independently justified the Deputies' entry into the home. .........................................23

        D.    Appellants never carry their burden of identifying clearly established law that prohibited the Deputies' conduct under the circumstances they confronted. ...................................26

II. The district court correctly granted summary judgment on Appellants' excessive-force claims because the Deputies' use of deadly force was objectively reasonable under the Fourth Amendment and, in any event, the Deputies are entitled to qualified immunity....................................................................28

    A. The Deputies' use of deadly force was objectively reasonable because Guillermo posed an immediate threat of serious bodily harm when they fired. ...........................................28

    B. Appellants' contrary arguments about warnings, alternative force, the number and location of the wounds, and post-shooting handcuffing do not create a triable excessive-force claim. .........................................................32

    C. In any event, Appellants cannot show that clearly established law prohibited the Deputies' conduct under these circumstances. ...............................................36

III. The district court correctly granted summary judgment on Appellants' § 1983 claims against Hidalgo County because, absent an underlying constitutional violation by the Deputies, the County cannot be liable. ....................................................39

IV. The district court correctly granted summary judgment on Appellants' Texas Tort Claims Act claim against Hidalgo County because the County did not waive immunity for claims arising from the Deputies' intentional shooting of Guillermo. .............40

V. The district court did not abuse its discretion in denying Appellants' Rule 59(e) motion because the purported new evidence was not newly discovered evidence warranting alteration of the judgment. ...................................................42

CONCLUSION ............................................................................45

CERTIFICATE OF SERVICE .........................................................46

CERTIFICATE OF COMPLIANCE ..................................................47

# TABLE OF AUTHORITIES

## Cases

*Amador v. Vasquez*, 961 F.3d 721 (5th Cir. 2020) ....................................................38

*Barnes v. Felix*, 605 U.S. 73 (2025) ................................................................... 29, 32

*Carnaby v. City of Houston*, 636 F.3d 183 (5th Cir. 2011) .......................................19

*Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d
849 (5th Cir. 2012) ...................................................................................................39

*Elizondo v. Green*, 671 F.3d 506 (5th Cir. 2012) ...............................................29-31

*Gange v. City of Galveston*, 805 F.2d 558 (5th Cir. 1986) ....................................43-44

*Garza v. Briones*, 943 F.3d 740 (5th Cir. 2019) ......................................................34

*Glenn v. City of Tyler*, 242 F.3d 307 (5th Cir. 2001) ................................................20

*Graham v. Connor*, 490 U.S. 386 (1989) ............................................................ 29, 32

*Harris v. Serpas*, 745 F.3d 767 (5th Cir. 2014) ......................................................37

*Hogan v. Cunningham*, 722 F.3d 725 (5th Cir. 2013) ...............................................23

*Johnson v. Hollins*, 716 Fed. Appx. 248 (5th Cir. Dec. 1, 2017) .............................35

*Kisela v. Hughes*, 584 U.S. 100 (2018) ...................................................................37

*Mace v. City of Palestine*, 333 F.3d 621 (5th Cir. 2003) ...................................... 31, 37

*Manzanillo v. Jacquez*, 555 Fed. Appx. 651 (9th Cir. 2014) ....................................43

*Morrow v. Meachum*, 917 F.3d 870 (5th Cir. 2019) .........................................26, 36-38

*Pineda v. City of Houston*, 175 S.W.3d 276 (Tex. App.—Houston
[1st Dist.] 2004, no pet.) .....................................................................................41-42

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) ...............................................................34

*Ramirez v. Knoulton*, 542 F.3d 124 (5th Cir. 2008) .......................................28, 34, 37

*Reyes v. Bridgwater*, 362 F. Appx. 403 (5th Cir. 2010) .............................................38

*Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011) ........................................................31

*Rockwell v. City of Garland, Tex.*, No. 3:08-CV-00251, 2010 WL 3384833 (N.D. Tex. June 10, 2010)..................................................................24

*Scott v. Harris*, 550 U.S. 372 (2007) .........................................................................19

*Shepherd v. City of Shreveport*, 920 F.3d 278 (5th Cir. 2019) ......................................31

*Templet v. HydroChem Inc.*, 367 F.3d 473 (5th Cir. 2004) ..........................................42

*Tennessee v. Garner*, 471 U.S. 1 (1985) ....................................................................29

*Tijerino v. Miller*, No. 25-30306, 2026 WL 85052 (5th Cir. Jan. 12, 2026) ............................................................................................... 42-43

*Torres v. Livingston*, 972 F.3d 660 (5th Cir. 2020) .....................................................42

*United States v. Jenkins*, 46 F.3d 447 (5th Cir. 2015) .................................................16

*United States v. Toussaint*, 838 F.3d 503 (5th Cir. 2016)............................................23

**Statutes**

TEX. CIV. PRAC. & REM. CODE § 101.021.................................................................40

TEX. CIV. PRAC. & REM. CODE § 101.057.................................................................40

TEX. CODE CRIM. PROC. ART. 14.03 ..................................................... 20, 22, 24

TEX. CODE CRIM. PROC. ART. 5.01 ........................................................................24

TEX. FAM. CODE § 71.004.......................................................................................20

TEX. PENAL CODE § 22.01......................................................................................20

## STATEMENT OF ISSUES PRESENTED

Issue 1:   Whether the district court correctly granted summary judgment on Appellants' Fourth Amendment claims for unlawful entry, arrest, and seizure where the summary-judgment record established that Maura Sanchez had authority to consent and did consent to the Deputies' entry, that the Deputies independently had probable cause to arrest Guillermo for assault involving family violence, that exigent circumstances independently justified immediate entry, and that, in any event, the Deputies are entitled to qualified immunity.

Issue 2:   Whether the district court correctly granted summary judgment on Appellants' excessive-force claims where the summary-judgment record established that the Deputies' use of deadly force was objectively reasonable under the Fourth Amendment and that, in any event, the Deputies are entitled to qualified immunity.

Issue 3:   Whether the district court correctly granted summary judgment on Appellants' 42 U.S.C. § 1983 claims against Hidalgo County where, absent an underlying constitutional violation by the Deputies, the County cannot be liable.

Issue 4:   Whether the district court correctly granted summary judgment on Appellants' Texas Tort Claims Act claim against Hidalgo County where the claim arises from the Deputies' intentional shooting of

Guillermo and therefore falls within the Act's intentional-tort exception.

Issue 5: Whether the district court abused its discretion in denying Appellants' Rule 59(e) motion where the purported "new evidence" was available before judgment, was not timely presented to the district court, and in any event would not have changed the result.

## STATEMENT OF THE CASE

### I.    Plaintiffs' live pleading and removal to federal court.

This appeal arises from the October 6, 2021 shooting death of 25-year-old Guillermo San Miguel Sanchez ("Guillermo"), who was shot at the Weslaco, Texas home that he shared with his mother, Maura Sanchez. ROA.102-03, 796-800. In their live Second Amended Petition, Guillermo's parents—Maura Sanchez and Guillermo San Miguel Martinez, individually and as representatives of Guillermo's estate—sued Hidalgo County, Deputy Brian Ayala, and Deputy Juan Flores. ROA.100-01. The Second Amended Petition alleged that Ayala and Flores ("the Deputies") entered the residence, encountered Guillermo near his bedroom, and shot him. ROA.102-03. The petition sought wrongful-death and survival damages arising from Guillermo's death. ROA.104-05. Based on those allegations, Plaintiffs asserted a Texas Tort Claims Act claim against Hidalgo County; a municipal-liability claim under 42 U.S.C. § 1983 against the County; and § 1983 claims against the Deputies for unlawful entry, unlawful arrest, and excessive force. ROA.105-16. The suit began in Texas state court, but Hidalgo County removed the action to the Southern District of Texas on federal-question grounds. ROA.13-15.

10

## II. The district court granted summary judgment on all claims asserted and entered final judgment.

After discovery, Defendants moved for final summary judgment ("the MSJ"). ROA.323. This led to Plaintiffs filing a response, Defendants filing a reply, Plaintiffs filing a surreply, and Defendants filing a response to that surreply—all of which the district court considered. ROA.691, 937, 965, 990, 1021, 1163.

Defendants' summary-judgment evidence showed that the Deputies responded to a 911 call reporting that Guillermo had punched his mother, Maura, in the face at the Weslaco home they shared. ROA.553-55, 557, 800, 910. When Flores arrived, Maura reported the assault, exhibited visible facial injury, and explained that Guillermo had locked himself inside the home. ROA.553-57, 910. The Deputies also learned that Guillermo was suffering from untreated mental-health problems. ROA.557-58, 563. Although Maura initially said that she wanted to wait for her daughter to arrive with a key, the situation escalated when Guillermo shattered a window from inside the house, after which the body-camera recordings captured Maura's voice directing the Deputies to open or break the door. ROA.532, 537, 789, 981-82. After entering the home, the Deputies repeatedly identified themselves as law enforcement and called out to Guillermo as they moved through the residence. ROA.537, 789, 1176. They then encountered Guillermo in a back bedroom holding a large kitchen knife.

11

ROA.415-16, 424, 750. From that point forward, the Deputies repeatedly ordered Guillermo to drop the knife and repeatedly attempted to talk with him. ROA.335-37, 537, 789, 1176. When Guillermo refused those commands, emerged from the bedroom still armed, and moved toward the Deputies from only eight to ten feet away inside the house, both Deputies fired. ROA.387, 424, 435-38, 537, 552, 646.

The district court signed a comprehensive order granting Defendants' motion for final summary judgment. ROA.1163-84. The district court held that the record did not support Plaintiffs' Fourth Amendment claims against the Deputies, that Hidalgo County could not be liable under § 1983 absent an underlying constitutional violation, and that Plaintiffs' Texas Tort Claims Act claim was barred. *Id.* That same day, the district court entered final judgment dismissing all claims against all Defendants with prejudice. ROA.1185.

### III. The district court denied Rule 59(e) relief, substituted Maura Sanchez's heirs, and Appellants perfected this appeal.

After the district court entered final judgment, Plaintiffs moved under Rule 59(e) to alter or amend the judgment. ROA.1199. The motion principally argued that reconsideration was warranted based on an intervening change in law, purported new evidence, and clear error. *Id.* While the Rule 59(e) motion was pending, Plaintiffs also sought an order substituting Maura Sanchez's potential heirs for her, following her death on January 20, 2024. ROA.1186. On

November 7, 2025, the district court denied the Rule 59(e) motion. ROA.1547. That same day, the district court—to the extent necessary to permit resolution of the Rule 59(e) motion—granted the substitution motion and substituted Elsa M. Coronado, Magdalena Conde, Zenaida Sanchez, Cecilia Tusing, Mirta San Miguel, Alejandro San Miguel, and Mauro San Miguel for Maura Sanchez. ROA.1546. Guillermo's father and the substituting parties subsequently filed an amended notice of appeal challenging the order denying Rule 59(e) relief, the final judgment, and the order granting summary judgment. ROA.1567.

## SUMMARY OF THE ARGUMENT

Appellants' unlawful-entry and unlawful-arrest theories fail because the summary-judgment record established multiple independent grounds supporting the Deputies' conduct. Maura Sanchez had common authority over the home and consented to the Deputies' entry after Guillermo escalated the encounter by shattering a window from inside. Independently, the Deputies had probable cause to arrest Guillermo for assault involving family violence based on Maura's firsthand report, corroborating circumstances, and visible injury. And even apart from consent and probable cause, exigent circumstances justified immediate entry because the Deputies confronted an escalating domestic-violence scene involving a mentally unstable suspect who had shut himself inside the residence after assaulting his mother and then intensified the danger from within. At minimum, Appellants failed to identify clearly established law that would have placed beyond debate that entry and arrest were unlawful under those circumstances.

Appellants' excessive-force challenge fares no better. The Deputies encountered Guillermo armed with a large kitchen knife inside a confined space after repeated commands to drop the weapon, surrender, and stop advancing. When Guillermo emerged from a bedroom still armed and moved toward the Deputies from only eight to ten feet away inside the home, the Deputies acted reasonably in perceiving an immediate threat of serious bodily harm and

responding with deadly force. Appellants' contrary focus on the absence of a final warning, the availability of less-lethal tools, the number and location of the wounds, and the post-shooting handcuffing does not create a genuine issue of material fact. Nor do Appellants identify clearly established law prohibiting the Deputies' conduct in a case involving a recently violent, mentally unstable suspect who ignored repeated commands, remained armed, and advanced at close range.

Because the Deputies committed no constitutional violation, Hidalgo County likewise cannot be liable under § 1983. The district court also correctly rejected Appellants' Texas Tort Claims Act claim against Hidalgo County. That claim arises from the Deputies' intentional shooting of Guillermo, and the TTCA does not waive immunity for claims arising out of assault, battery, or any other intentional tort. The summary-judgment record contains no evidence of an accidental or inadvertent discharge; to the contrary, Appellants' own theory is that the Deputies intentionally fired without justification.

Finally, the district court acted within its discretion in denying Appellants' Rule 59(e) motion. The purported "new evidence" was available before judgment, was never timely presented to the district court, and in any event would not have changed the result. The judgment should therefore be affirmed in full.

## ARGUMENT

I. **The district court correctly granted summary judgment on Appellants' unlawful-entry and unlawful-arrest claims because the Deputies did not violate the Fourth Amendment and, in any event, are entitled to qualified immunity.**

    A. **The Deputies' entry was lawful because Maura Sanchez had authority to consent and did consent.**

Appellants' unlawful-entry theory fails because the summary-judgment record establishes both that Maura Sanchez had common authority over the home and that she later consented to the Deputies' entry after Guillermo escalated the encounter by breaking the window from inside the house. ROA.518, 531-32, 537 (video at 2:52 & 3:03), 789 (video at 6:52 & 7:04), 981-82. A third party with common authority over the premises may validly consent to entry; the Fourth Amendment does not require proof that the consenting person held title to the property or happened to have a key in hand when officers arrived. *United States v. Jenkins*, 46 F.3d 447, 454-55 (5th Cir. 2015). Appellants' assertion that Maura lacked common authority because she did not possess a key at the moment of the Deputies' arrival therefore misstates both the law and the record. Guillermo had locked the door from inside after assaulting Maura and then shut himself inside the residence. That circumstance did not strip Maura of authority over the home; it showed only that she had been excluded from immediate entry by the very person who had just attacked her. Indeed, Appellants' own affidavits defeat their position. Georgina Turrubiartes, whom Appellants presented as

16

Maura's longtime friend, and Ana Cecilia Rangel, whom Appellants presented as Maura's daughter-in-law, each described the subject residence as "the home of Maura Sanchez and her son, Guillermo San Miguel Sanchez." ROA.796, 787. Appellants even presented a translated transcription of Ayala's body-camera recording, wherein Maura states that Guillermo has locked her out of her own home. ROA.976-77. Thus, even Appellants' own evidence established that Maura resided with Guillermo and exercised common authority over the premises.

Appellants' reliance on the post-incident search-warrant affidavit is even less persuasive. *See* APPELLANTS' BRIEF at 11 (citing to affidavit at ROA.910). That affidavit was executed after the shooting as part of the ensuing criminal investigation, and by its own terms it was directed to identifying the "Suspected Party" believed to be "in charge of" the place to be searched. ROA.910-11. It lists Guillermo as the "Resident/Suspect" and it lists "[a]ny other suspects unknown to the affiant." ROA.910 (all caps omitted). That language does not purport to identify every resident of the property, every person with common authority over it, or every person lawfully entitled to enter it. It identifies the suspected party or parties for purposes of the warrant application. Maura was not listed for the obvious reason that she was not a suspected party. The same affidavit separately identifies her as the mother whom the Deputies encountered at the scene and as the person who reported that her son had assaulted her.

ROA.910. Appellants thus misread a warrant document aimed at identifying suspects as though it were some conclusive occupancy record. It was nothing of the kind, and it certainly did not establish that Guillermo was "the only person who lived in the house." APPELLANTS' BRIEF at 11. The district court thus correctly rejected that detour and correctly focused instead on common authority. ROA.1171-73.

The record also establishes actual consent. At the outset, Maura indicated that she wanted to wait for her daughter to arrive so the daughter could either open the door with a key or try to persuade Guillermo to open the door voluntarily. ROA.531, 977-78. But that initial position did not remain static. Guillermo then shattered the window from inside the home, and the body-camera recordings captured the resulting escalation. ROA.537, 788. After the sounds of breaking glass, a female voice captured on body-camera videos yelled at the Deputies to open or break the door—stating "abre la puerta" and "quiebre la puerta, oiga." ROA.537 (video at 2:52 & 3:03), 789 (video at 6:52 & 7:04). Appellants' own evidence confirmed that "quiebre la puerta, oiga" translates to "hey, break the door open." ROA.981-82. The district court thus reasoned that, although Maura initially preferred to wait for her daughter, the recordings and surrounding record evidence support the conclusion that Maura herself later told the Deputies to open or break the door after Guillermo shattered the window from inside the home. ROA.1172.

Appellants' contrary evidence does not create a genuine dispute of material fact on that point. Turrubiartes's and Rangel's affidavits say that Maura never gave consent, and Turrubiartes's statement to investigators similarly says that Maura did not want the Deputies let in. ROA.796-800. But those after-the-fact characterizations do not overcome the contemporaneous recordings, especially where Appellants' own retained interpreter, Monica Rossler, confirmed the substance of the critical command and merely swore that she could not personally identify which female voice made it. ROA.981-82. The district court thus correctly concluded that Rossler's affidavit did not create a genuine dispute merely because Rossler could not identify the speaker. Neither Turrubiartes nor Rangel identified herself as the woman who yelled for the Deputies to open or break the door, and the body-camera recordings themselves supported the conclusion that the speaker was Maura. ROA.939-40, 1172-73. Nor is there any merit to Appellants' suggestion that the district court acted as its own interpreter or witness. The district court did not invent a translation in the face of competing certified translations; Appellants' own translator confirmed the substance of the critical command. The court then did what *Scott* and *Carnaby* permit: it measured Appellants' later account against the contemporaneous video-and-audio evidence. That evidence foreclosed a genuine dispute. See *Scott v. Harris*, 550 U.S. 372, 381 (2007); *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).

19

**B.    The Deputies had probable cause to arrest Guillermo for assault involving family violence.**

Appellants' unlawful-arrest and unlawful-seizure claims fail because the Deputies had probable cause to arrest Guillermo for assault involving family violence. As Appellees argued below, and as the district court correctly recognized, probable cause exists when the totality of the facts and circumstances within the officers' knowledge would warrant a reasonable person concluding that the suspect had committed or was committing an offense. *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001). ROA.331-32, 1173-74. Texas law specifically authorizes a warrantless arrest when a peace officer has probable cause to believe a person has committed an offense involving family violence. TEX. CODE CRIM. PROC. art. 14.03(a)(4), (f); TEX. FAM. CODE § 71.004(1); TEX. PENAL CODE § 22.01(a), (b). Appellants' brief never seriously grapples with this standard. Instead, it attempts to minimize the offense and the information known to the Deputies. Most notably, Appellants say Guillermo had "allegedly *slapped* his mother in the face." APPELLANTS' BRIEF at 1 (emphasis added). But the summary-judgment record does not describe the assault that way.

The summary-judgment record shows that Guillermo did not merely "slap" Maura, as Appellants now suggest. Rather, Appellants' own evidence shows that Georgina Turrubiartes—Maura's friend and an eyewitness—reported that Guillermo punched Maura in the face. ROA.800. The post-incident search-

20

warrant affidavit likewise reflects that Maura reported to the Deputies that she had been assaulted by her son. ROA.910. And, as the district court recognized, the record further showed that the Deputies understood Guillermo had punched Maura in the face and that they observed visible injury to her face. ROA.1173-74. Appellants' use of the word "slap" is therefore not a faithful description of the record. It is an attempt to minimize the seriousness of the assault that gave the Deputies probable cause to act.

Against that backdrop, the facts known to the Deputies at the scene easily satisfied the governing standard. Flores arrived first and spoke directly with Maura, who told him that Guillermo had struck her and was inside the house. ROA.553-57. Flores then requested additional assistance, and when Ayala arrived, Flores briefed him on the information Maura had provided, including the assault and Guillermo's mental-health problems. ROA.557, 1173-74. The Deputies were therefore not acting on rumor or vague suspicion. They were acting on a victim's firsthand report, corroborated by what they personally observed and by the surrounding circumstances. As the district court explained, the record supplied evidence both that Maura had been injured and that Guillermo had caused the injury, thereby establishing facts and circumstances sufficient to allow a reasonable officer arriving on the scene to conclude that Guillermo had committed an arrestable offense. ROA.1173-74. Given those

facts, the Deputies had probable cause to arrest Guillermo for assault involving family violence.

Appellants' contrary points do not create a genuine dispute on probable cause. Appellants first argue that the call was initially classified as a "welfare check." APPELLANTS' BRIEF at 26. But dispatch's preliminary label does not define the Fourth Amendment analysis. What matters is what the Deputies learned once they arrived, and by then they had ample reason to believe Guillermo had just committed family violence against Maura. Appellants next argue that the body-camera videos supposedly do not show injury to Maura clearly enough. *Id.* But probable cause does not require courtroom-quality proof or a perfectly framed body-camera image before officers may credit a victim's firsthand report, particularly where that report is corroborated by the circumstances confronting them at the scene. As the district court correctly held, the record supplied evidence both of injury and of causation, and that was enough. ROA.1173-74. Lastly, Appellants argue that there was no "active or on-going crime" when the Deputies reached the residence. APPELLANTS' BRIEF at 26-27. But article 14.03(a)(4) does not require that the family-violence offense still be occurring at the precise moment of arrest; it authorizes a warrantless arrest when the officer has probable cause to believe the person has committed an offense involving family violence. TEX. CODE CRIM. PROC. art. 14.03(a)(4).

Appellants are thus attempting to graft onto the statute a limitation that does not exist.

The district court therefore got this exactly right. It rejected Appellants' argument that no evidence showed Maura had sustained injury or that Guillermo caused it, and it correctly held that the summary-judgment record established facts and circumstances sufficient to allow a reasonable officer to conclude Guillermo had committed an arrestable offense. ROA.1173-74. That holding defeats Appellants' unlawful-arrest and unlawful-seizure theories.

### C. Exigent circumstances independently justified the Deputies' entry into the home.

Appellants' unlawful-entry theory further fails because exigent circumstances independently justified the Deputies' immediate entry into the home. As Appellees argued below, officers may enter a home without a warrant when they have probable cause and exigent circumstances. ROA.331-33, 941-43. *Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013). And the exigency inquiry is objective, not subjective: an action is reasonable under the Fourth Amendment if the circumstances, viewed objectively, justify it. *United States v. Toussaint*, 838 F.3d 503, 508-09 (5th Cir. 2016). Appellants therefore cannot defeat this alternative ground for affirmance by asserting that the Deputies were motivated only by a desire to arrest Guillermo. The question is whether the circumstances

confronting the Deputies created an objectively reasonable basis for immediate action. And they did.

By the time the Deputies entered the house, they were confronting an escalating domestic-violence scene. Flores had already spoken directly with Maura and learned that Guillermo had punched her in the face and locked himself inside the residence. ROA.553-57. Flores also relayed to Ayala that Guillermo suffered from untreated mental-health problems. ROA.563. Appellants' own witness, Georgina Turrubiartes, likewise reported that she called 911 after seeing Guillermo punch his mother in the face, and that Guillermo then ran inside and locked the door. ROA.800. The Deputies thus had objective grounds to believe Guillermo had just committed family violence against his mother. That conclusion materially shaped the risks the Deputies were required to confront at the scene. Domestic disputes are particularly combustible, and officers at the scene are entitled to special deference in evaluating the dangers they face. *Rockwell v. City of Garland, Tex.*, No. 3:08-CV-00251, 2010 WL 3384833, at *8 (N.D. Tex. June 10, 2010). Texas law reflects the same urgency. Article 5.01(a) declares that family violence is a "serious danger and threat," and article 14.03(c) required the Deputies to remain at the scene if reasonably necessary to verify the allegation and prevent further family violence. TEX. CODE CRIM. PROC. arts. 5.01(a), 14.03(c).

Those already-serious risks did not remain static; they intensified when Guillermo shattered a window from inside the house. Ayala testified that he moved toward the back of the house, that Guillermo then broke a window from inside, and that Ayala thereafter decided to force entry. ROA.399, 402, 409. At that point, the encounter had moved beyond an initial welfare-check response. It had become a volatile confrontation involving an assailant who had shut himself inside the house after attacking his mother, locked her out, refused to come out, and then escalated matters by shattering the window while officers and family members remained outside. The Deputies were entitled to view that conduct not merely as additional property damage, but as creating an immediate safety risk—including the reasonable possibility that Guillermo had broken the window to create a shooting lane from inside the house. ROA.516. The Deputies were likewise entitled to view his conduct as posing a danger to Maura, to others on the scene, to Guillermo himself, and to the officers. *Id.* Under *Hogan* and *Toussaint*, the Fourth Amendment did not require them to stand outside indefinitely and hope the situation would de-escalate on its own.

Appellants' contrary points do not undermine that conclusion. Dispatch's initial use of the phrase "welfare check" does not control the constitutional analysis. Nor were the Deputies required to assume there was no immediate danger simply because Maura had earlier said that Guillermo had no weapons. By the time the Deputies entered the residence, they were no longer dealing with

25

a static report of a family disturbance; they were confronting a suspect who had shut himself inside the house after assaulting his mother, locked her out, refused to come out, and then escalated the encounter by shattering a window from inside the house. The relevant question is objective reasonableness in light of those rapidly evolving circumstances. On this record, exigent circumstances independently justified immediate entry, and the Court should affirm on that basis as well.

### D.    Appellants never carry their burden of identifying clearly established law that prohibited the Deputies' conduct under the circumstances they confronted.

Even if this Court were to conclude that Appellants identified a triable issue as to consent, probable cause, or exigent circumstances, the Deputies would still be entitled to qualified immunity because Appellants do not identify clearly established law prohibiting the Deputies' conduct under these circumstances. As Appellees argued below, Appellants bear a "heavy" burden to show that the challenged conduct violated clearly established law. ROA.333, 338. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). That burden cannot be satisfied with broad Fourth Amendment platitudes stated at a high level of generality. Existing precedent must have placed the constitutional question "beyond debate" in the particular circumstances confronting the officers. *Id.* Appellants therefore had to identify precedent involving materially similar facts. Those facts would include an elderly mother reporting that her adult son had just punched her in the face,

26

a suspect who had shut himself inside the home, untreated mental-health problems, the victim locked out of the residence, and an immediate escalation marked by the suspect's breaking of a window from inside. Appellants then had to show that, under such circumstances, controlling law clearly prohibited the Deputies from entering. Their brief does not do that.

Instead, Appellants offer only general statements about the Fourth Amendment and general citations for the proposition that warrantless home entry requires a warrant, consent, or probable cause plus exigent circumstances. APPELLANTS' BRIEF at 7-9, 25-26. But those general propositions do not answer the actual qualified-immunity question here. They do not identify controlling law holding that officers facing these facts were constitutionally required to remain outside. And because Appellants never identify such authority, they never carry the clearly-established-law burden.

The facts known to the Deputies at the moment of entry underscore why this was not a case of clearly established illegality. The Deputies had probable cause to believe Guillermo had just committed family violence against Maura. ROA.553-57, 800, 910. They also knew Guillermo had locked himself inside the home, was refusing to come out, and suffered from untreated mental-health problems. ROA.557. The situation then escalated when Guillermo shattered the window from inside the house. ROA.399, 402, 409. And, as explained above, the body-camera recordings captured a female voice directing the Deputies to open

27

or break the door. ROA.981-82. Even if Appellants could identify some factual dispute about one or another of those points, that still would not answer the qualified-immunity question. The issue is whether every reasonable officer would have known, beyond debate, that entry was unlawful under that combination of circumstances. On this record, at minimum, officers of reasonable competence could disagree. That alone defeats Appellants' effort to overcome qualified immunity, particularly because Appellants identify no controlling authority holding that officers facing comparable facts were required to remain outside..

**II.   The district court correctly granted summary judgment on Appellants' excessive-force claims because the Deputies' use of deadly force was objectively reasonable under the Fourth Amendment and, in any event, the Deputies are entitled to qualified immunity.**

    **A.   The Deputies' use of deadly force was objectively reasonable because Guillermo posed an immediate threat of serious bodily harm when they fired.**

The district court correctly granted summary judgment on Appellants' excessive-force claims because, under the totality of the circumstances, the Deputies' use of deadly force was objectively reasonable. The governing standard is settled. A plaintiff asserting excessive force under the Fourth Amendment must show an injury resulting from force that was clearly excessive and objectively unreasonable. *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013). And where, as here, deadly force is involved, the question is whether the officers had probable cause to believe the suspect posed a threat of serious physical harm

to the officers or others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012). That inquiry must account for all relevant circumstances leading up to the shooting, not a single freeze-frame selected in hindsight. *Barnes v. Felix*, 605 U.S. 73, 80 (2025). It must also be conducted from the perspective of a reasonable officer on the scene, with due regard for the fact that officers are often required to make split-second judgments in tense, uncertain, and rapidly evolving conditions. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). On this record, the Deputies' use of deadly force readily satisfies that standard.

By the time they moved through the home and reached Guillermo's back bedroom, the Deputies knew that Guillermo had just punched Maura in the face, was mentally ill and off his medication, and had locked Maura out of the home after the assault. ROA.558-63. Once the Deputies encountered Guillermo in the bedroom, they saw he was armed with a large kitchen knife. ROA.537 (video at 3:50). The body-camera recordings show that the encounter inside the home did not culminate in a reflexive split-second response. Rather, after locating Guillermo, the Deputies repeatedly identified themselves as law enforcement, repeatedly ordered him to drop the knife, repeatedly told him not to come near them, and repeatedly tried to talk with him before firing. ROA.537. Under *Barnes* and *Graham*, those preceding circumstances matter. They show that the Deputies were confronting a recently violent, mentally unstable suspect armed with a knife

29

in a confined interior space after repeated efforts to secure compliance without force.

Ayala's body-camera recording further shows that roughly 3.5 minutes elapsed between the Deputies' entry into the home and the shooting. ROA.537 (video 3:50-7:13). During that interval, the Deputies encountered Guillermo seated inside his bedroom, armed with a large knife and positioned in front of a desk. *Id.* Guillermo first rose with the knife in hand and moved toward the doorway, in the Deputies' direction, only to shut the bedroom door. *Id.* That door had no knob or lock; instead, there was a hole where the knob should have been, which allowed the Deputies to see into the room. *Id.* When Ayala later nudged the door open and moved away, Guillermo again approached the doorway, still armed, and stood there for about fifteen seconds. *Id.* During that interval, he told the Deputies to get out of the house, refused their repeated efforts to speak with him, and pointed the knife at them multiple times before retreating into the bedroom and closing the door again. *Id.* While the door was closed after that second confrontation, Guillermo yelled that he would not speak to the Deputies because they were "pigs," and he demanded that they "get the f**k out" of the home. *Id.*

The Deputies did not fire when Guillermo first moved toward the doorway only to shut the door. Nor did they fire during the later confrontation when he stood in the doorway, still armed, and repeatedly pointed the knife at

30

them before retreating into the bedroom. They fired only when Guillermo later moved through the doorway toward them, still armed. That sequence reflects not an overhasty resort to force, but restraint in the face of a prolonged and escalating threat.

This Court's precedent strongly supports the reasonableness of the Deputies' response. In *Mace v. City of Palestine*, the Court held it was not objectively unreasonable for an officer to shoot an intoxicated and uncooperative suspect who was armed with a sword and standing approximately eight to ten feet away in a confined space. 333 F.3d 621, 624-25 (5th Cir. 2003). In *Rockwell v. Brown*, this Court held it was objectively reasonable for officers to shoot a suspect armed with knives who charged in the direction of officers. 664 F.3d 985, 991-92 (5th Cir. 2011). In *Elizondo v. Green*, this Court likewise held an officer acted reasonably in shooting a suspect who failed to drop a knife, moved closer, and raised the knife in a threatening motion. 671 F.3d at 510. And in *Shepherd v. City of Shreveport*, this Court rejected the unsupported assertion that no serious threat is posed by a person wielding a knife ten feet away from an officer. 920 F.3d 278, 284-85 (5th Cir. 2019). All of these authorities are far closer to this case than the cases Appellants invoke. Guillermo was armed, openly hostile, mentally unstable, and moving toward the Deputies from only eight to ten feet away inside the house when he was shot. Under *Mace*, *Rockwell*, *Elizondo*, and *Shepherd*, the

district court correctly concluded that the Deputies use of deadly force was objectively reasonable.

Appellants' effort to recast Guillermo as nonthreatening depends on hindsight and on selective characterizations of the record. They emphasize that he was moving at a "walking pace," that the knife was in his left hand, and that at some moments it appeared angled downward. ROA.710. But the Fourth Amendment does not require officers to wait until a knife-wielding suspect is within arm's reach before defending themselves, nor does it require courts to evaluate deadly-force encounters frame by frame while ignoring the seconds immediately before and after. *Barnes*, 605 U.S. at 80; *Graham*, 490 U.S. at 396-97. The undisputed facts remain that Guillermo refused repeated commands to disarm, remained openly hostile to the Deputies, emerged from the room still armed, and advanced toward them inside a confined space from a distance of only eight to ten feet. ROA.424, 435-38, 645-46, 788 at 7:08-7:13. On those facts, no reasonable jury could find that the Deputies acted unreasonably in perceiving an immediate threat of serious bodily harm or in responding with deadly force.

**B.    Appellants' contrary arguments about warnings, alternative force, the number and location of the wounds, and post-shooting handcuffing do not create a triable excessive-force claim.**

Appellants try to avoid summary judgment by isolating a handful of facts and treating each as dispositive: that the Deputies did not give a warning in the

final seconds before they fired; that they possessed Tasers, batons, and pepper spray; and that Guillermo sustained multiple wounds, including wounds to his back. But none of those points creates a genuine issue of material fact under controlling law.

Appellants first emphasize that the Deputies did not give Guillermo a fresh command to drop the knife or stop advancing within the final ten seconds before the shooting. But the Fourth Amendment does not impose a stopwatch rule under which otherwise reasonable deadly force becomes unconstitutional unless officers repeat a command at some fixed interval immediately before firing. Here, the record shows that warnings had already been given repeatedly. The body-camera footage reflects that the Deputies repeatedly identified themselves, repeatedly ordered Guillermo to drop the knife, repeatedly told him not to approach, and repeatedly attempted to talk him down. ROA.537, 789. Guillermo ignored those commands, kept the knife, shut the bedroom door, and then emerged still armed and moving toward the Deputies. *Id.* By that point, the Deputies were facing a rapidly unfolding threat inside a confined space from a distance of roughly eight to ten feet. ROA.435-36, 646. On those facts, the absence of a new command in the final second or two before the first shot does not render their response objectively unreasonable.

Appellants' reliance on the availability of less-lethal options fares no better. They stress that the Deputies had Tasers, batons, and pepper spray, and

33

they argue that the existence of those tools should have precluded deadly force. APPELLANTS' BRIEF at 32-33. But this Court's jurisprudence does not require officers to exhaust every conceivable nonlethal option before using deadly force against an armed suspect who poses an immediate threat of serious bodily harm. As Appellees argued below, this Court has expressly rejected the notion that courts should invalidate otherwise reasonable uses of force merely because some creative alternative can be imagined after the fact. ROA.948-49. *Ramirez v. Knoulton*, 542 F.3d 124, 129-30 (5th Cir. 2008). The question is not whether some alternative was theoretically available; it is whether the officers acted unreasonably in failing to pursue it. *Id.* Here, given Guillermo's refusal to disarm, his continued possession of the knife, his movement toward the Deputies from only eight to ten feet away, and the confined interior setting, no reasonable jury could conclude that the Deputies acted unreasonably in not trying pepper spray or a Taser before defending themselves with their firearms.

The same is true of Appellants' focus on the number and location of the shots. Appellants repeatedly stress that the Deputies fired eleven rounds and that the autopsy showed wounds to Guillermo's back and buttocks. APPELLANTS' BRIEF at 3, 35, 40, 42. But the Supreme Court and this Court have both made clear that, when officers are justified in firing to stop an immediate threat, they need not stop shooting until the threat has ended. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014); *Garza v. Briones*, 943 F.3d 740, 747-48 (5th Cir. 2019). Here, the

record shows that all shots occurred within a two-second timespan, in rapid succession, during a brief and fluid encounter after Guillermo emerged armed and advanced toward the Deputies. ROA.537, 789; *see* ROA.949-53. The mere fact that some rounds struck Guillermo as his body turned or fell does not create a triable issue of excessive force. Nor do the cases Appellants cite change that result. Those cases involved materially different circumstances, including suspects who were motionless, much farther away, not advancing, not threatening officers, or already incapacitated. By contrast, Guillermo was armed, noncompliant, and moving toward the Deputies in close quarters at the time the shots were fired. Under *Plumhoff*, *Garza*, *Mace*, and *Shepherd*, Appellants' emphasis on the shot count and wound locations does not transform a constitutionally reasonable response into an excessive-force claim.

Finally, Appellants' passing reliance on the handcuffing of Guillermo after the shooting does not salvage their excessive-force claim. APPELLANTS' BRIEF at 35, 42. As Appellees argued below, this Court has frequently treated handcuffing as a de minimis use of force, and Appellants have never shown that the handcuffing caused any cognizable, independent injury supporting a separate excessive-force theory. ROA.954. *See, e.g., Johnson v. Hollins*, 716 Fed. Appx. 248, 253 (5th Cir. Dec. 1, 2017). In any event, officers were entitled to secure Guillermo and the scene before the arrival of other responders. Nothing about that conduct changes the reasonableness analysis.

In short, none of Appellants' piecemeal objections—whether based as the lack of a final warning, the availability of less-lethal options, the number and location of the wounds, or the post-shooting handcuffing—creates a genuine dispute of material fact. None of those points undermine the central reality confronting the Deputies: Guillermo remained armed with a knife, had ignored repeated commands to drop it, and advanced toward them at close range inside the home. Under those circumstances, the district court correctly held that the Deputies' use of force was objectively reasonable as a matter of law.

**C.    In any event, Appellants cannot show that clearly established law prohibited the Deputies' conduct under these circumstances.**

Even if this Court were to conclude that Appellants have identified some triable issue on the objective-reasonableness prong, the Deputies would still be entitled to qualified immunity because Appellants cannot satisfy the second prong. As Appellees argued below, this burden is "heavy" and "demanding." ROA.338. *Morrow*, 917 F.3d at 874. Appellants cannot overcome qualified immunity by invoking the general proposition that a person has a Fourth Amendment right to be free from excessive force. Nor can they rely on broad statements that deadly force is permissible only when an officer has probable cause to believe the suspect poses a threat of serious harm. Those propositions are too general. To defeat qualified immunity, Appellants had to identify precedent that placed "beyond debate" that officers confronted with these

particular circumstances—a recently violent and mentally unstable suspect, armed with a large kitchen knife, who had ignored repeated commands to drop it, emerged from his bedroom still armed, and advanced toward officers from only eight to ten feet away inside a home—could not respond with deadly force. *See Morrow*, 917 F.3d at 874. They have identified no such case.

The authorities Appellees cited below confirm the absence of clearly established law in Appellants' favor. ROA.338-40. In *Mace v. City of Palestine*, this Court held that an officer did not act unreasonably in shooting an intoxicated, uncooperative suspect who wielded a sword from approximately eight to ten feet away in a confined area. 333 F.3d at 624-25. In *Ramirez v. Knoulton*, this Court held that officers did not violate clearly established law when they shot an emotionally unstable and armed suspect whom they reasonably perceived as threatening. 542 F.3d at 129-31. In *Harris v. Serpas*, this Court found no constitutional violation where officers entered a room and shot a suicidal suspect after he raised a knife and advanced toward them. 745 F.3d 767, 772-74 (5th Cir. 2014). And in *Kisela v. Hughes*, the Supreme Court held that an officer did not violate clearly established law by shooting a knife-wielding woman, despite the fact that the threat facing the officer there was materially less acute than the threat facing the Deputies here. 584 U.S. 100, 104-06 (2018). If officers in those cases were not on clear notice that their use of deadly force was unlawful, then the Deputies certainly were not on notice here, where Guillermo had already

37

assaulted his mother, refused repeated commands to drop the knife, and advanced toward the Deputies inside the home from close range.

Appellants' cited authorities do not carry their burden because they involve materially different facts. *See* APPELLANTS' BRIEF at 35-37. The suspects in Appellants' cases were often stationary, significantly farther away, not advancing, not threatening officers, or otherwise presenting a markedly reduced immediate danger. *See* ROA.954-58. That is true, for example, of *Amador v. Vasquez*, where the suspect stood several feet away with his hands raised in a surrender position, 961 F.3d 721, 729-30 (5th Cir. 2020), and *Reyes v. Bridgwater*, where the suspect was described as standing with a kitchen knife at his side at a safe distance away, 362 F. Appx. 403, 407 (5th Cir. 2010). Those circumstances bear little resemblance to the scene here. Guillermo was not standing still in surrender. He was not thirty feet away. He was not merely passively holding a knife while officers observed from safety. He was a recently violent suspect who remained armed, ignored repeated commands, emerged from his room, and moved toward the Deputies from only eight to ten feet away in the confined interior of a home. No authority Appellants cite clearly established that deadly force was forbidden in that situation.

That conclusion follows all the more strongly because qualified immunity protects officers unless every reasonable officer would have understood that the conduct was unlawful. *Morrow*, 917 F.3d at 874. At a minimum, officers of

38

reasonable competence could disagree about whether deadly force was permissible here. Appellees' cited precedent demonstrates that much, and Appellants have identified no case that resolves the issue the other way on materially similar facts. Thus, even if this Court were to disagree with the district court's conclusion that the Deputies' conduct was objectively reasonable, Appellants still cannot show that clearly established law prohibited the Deputies' conduct under these circumstances. The judgment should therefore be affirmed on this independent ground as well.

**III.   The district court correctly granted summary judgment on Appellants' § 1983 claims against Hidalgo County because, absent an underlying constitutional violation by the Deputies, the County cannot be liable.**

The district court correctly granted summary judgment on Appellants' § 1983 claims against Hidalgo County. ROA.1184. A municipality cannot be held liable under § 1983 unless the plaintiff establishes, among other things, an underlying violation of a constitutional right. *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866 (5th Cir. 2012). As the district court correctly recognized, even if County policy had served as the moving force behind the alleged injuries, there can be no § 1983 liability without a constitutional violation. ROA.1184 (citing *Doe*, 675 F.3d at 867). That rule controls here.

Appellants' municipal-liability theory rises or falls with their claims against the Deputies. In their brief, Appellants do not identify any independent basis on which Hidalgo County could be liable apart from proving that the Deputies violated Guillermo's Fourth Amendment rights. APPELLANTS' BRIEF at 43-44. But, as shown above, the district court correctly held that the Deputies committed no Fourth Amendment violation with respect to entry, arrest, or the use of force. ROA.1168-84. Because Appellants' claim against Hidalgo County depends on establishing an underlying constitutional deprivation by the Deputies, and because the district court correctly held that no such deprivation occurred, Hidalgo County was entitled to summary judgment as a matter of law.

## IV. The district court correctly granted summary judgment on Appellants' Texas Tort Claims Act claim against Hidalgo County because the County did not waive immunity for claims arising from the Deputies' intentional shooting of Guillermo.

The district court properly held that Appellants' Texas Tort Claims Act ("TTCA") claim against Hidalgo County is barred by the Act's intentional-tort exception. The TTCA waives governmental immunity in limited circumstances for personal injury or death caused by a condition or use of tangible personal property, but that waiver expressly "does not apply to a claim . . . arising out of assault, battery, false imprisonment, or any other intentional tort." TEX. CIV. PRAC. & REM. CODE §§ 101.021(2), 101.057(2). As Appellees argued below and as the district court recognized, Texas courts do not allow plaintiffs to evade that

40

exception by repackaging an intentional shooting as "negligence" merely because the instrumentality used was a government-issued firearm. ROA.323-28, 937-38, 1165-67. The Texas First Court of Appeals' opinion in *Pineda v. City of Houston* is directly on point: when the gravamen of the claim is that officers intentionally shot the decedent, immunity is not waived unless there is some evidence of an accidental shooting, such as an inadvertent discharge. 175 S.W.3d 276, 281-84 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

That rule resolves the TTCA claim because the summary-judgment record contains no evidence—none—that the Deputies fired accidentally, by mistake, or through an inadvertent discharge. To the contrary, the evidence is uniform. Ayala testified that he intentionally discharged his weapon seven times at Guillermo and that each of those discharges was purposeful. ROA.426-27. Flores likewise testified that he intentionally discharged his weapon four times at Guillermo and that his decision to do so was intentional. ROA.581, 585-86. The body-camera recordings are consistent with that testimony, and Appellants' merits theory below was never that the weapons somehow discharged accidentally. ROA.100-16, 691-713. Their theory was that the Deputies were not justified in intentionally firing because Guillermo did not pose an immediate threat. That theory, even if accepted, would still describe an intentional shooting, not negligence, for TTCA purposes. Indeed, Appellants themselves described the Deputies' conduct as intentional. Their appellate brief states that the

41

Deputies "both intentionally, knowingly, and purposely discharged their weapons." APPELLANTS' BRIEF at 31.

Because Appellants' TTCA claim arises from the Deputies' intentional shooting of Guillermo—and not from any accidental, mistaken, or inadvertent discharge of a firearm—the claim falls squarely within the TTCA's intentional-tort exception. *Pineda*, 175 S.W.3d at 281-84. Hidalgo County therefore did not waive its immunity, and the district court correctly granted summary judgment on the TTCA claim. ROA.1166-67.

## V.    The district court did not abuse its discretion in denying Appellants' Rule 59(e) motion because the purported new evidence was not newly discovered evidence warranting alteration of the judgment.

Rule 59(e) offers an extraordinary remedy; it does not permit a disappointed litigant to reopen summary-judgment proceedings with evidence that could have been presented before judgment. *See Tijerino v. Miller*, No. 25-30306, 2026 WL 85052, at *2 (5th Cir. Jan. 12, 2026); *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). To obtain relief on a "new evidence" theory, a movant must do more than identify material that was not part of the original summary-judgment record. It must show that the evidence was truly unavailable despite diligence and that reconsideration is necessary to avoid an unjust result. *Torres v. Livingston*, 972 F.3d 660, 663 (5th Cir. 2020). Appellants made no such showing.

Appellants' own Rule 59(e) motion established (1) that their police-practices expert, Roger W. Chappell, served his report in early April 2025; (2) that Hidalgo County produced the Sheriff's Office's High-Risk Situations policy on May 9, 2025; and (3) that the depositions of David Muniz (the Hidalgo County Sheriff's Office training coordinator) and Angelos Leiloglou (Defendants' photogrammetry expert) were taken on June 6, 2025. ROA.1199-1201. All of that occurred before the district court entered summary judgment on June 30, 2025. ROA.1163. And, as the district court correctly emphasized, Appellants had access to all of that material before judgment yet never sought leave to supplement the record with it, despite having time to do so. ROA.1550-51. That unexcused failure to timely present available material was itself a sufficient basis to deny Rule 59(e) relief. *See Tijerino*, 2026 WL 85052, at *2.

The district court also acted well within its discretion in concluding that the proffered material would not have changed the result. ROA.1551-52. Appellants principally relied on the Sheriff's Office's High-Risk Situations policy and on Muniz's testimony to argue that Deputies Ayala and Flores violated County policy by entering the home and using deadly force without awaiting a specialized response. ROA.1204-06. But even accepting Appellants' characterization of that evidence, a local policy violation would not itself establish a Fourth Amendment violation or defeat qualified immunity. *See Manzanillo v. Jacquez,* 555 Fed. Appx. 651, 653 (9th Cir. 2014); *see also Gange v. City*

*of Galveston*, 805 F.2d 558, 560 (5th Cir. 1986). More importantly, the district court correctly observed that Appellants' omitted portions of Muniz's testimony (later supplied by Appellees) undercut Appellants' own theory: Muniz acknowledged that the High-Risk Situations policy did not apply because the circumstances confronting the Deputies were not "beyond the resources of the standard patrol unit." ROA.1520, 1526-28, 1551-52. Given that testimony, the district court acted well within its discretion in concluding that the policy and Muniz's deposition lacked the dispositive importance necessary to justify reopening the judgment. ROA.1551-52.

The same is true of Chappell's report and Leiloglou's deposition. The district court correctly concluded that Chappell's opinions did not warrant Rule 59(e) relief because his view that the Deputies lacked authority to enter the home merely repackaged the same "but-for" theory the district court had already rejected. ROA.1205-06, 1552. Nor did Chappell undermine the district court's actual consent analysis: his report focused on the undisputed fact that Maura initially told the Deputies to wait for her daughter, not on the dispositive question of whether Maura later told the Deputies to open or break the door after Guillermo shattered the window from inside the home. ROA. 1552. Leiloglou's testimony likewise did not require a different result. Although Appellants emphasized that Leiloglou described the knife in Guillermo's left hand as pointed down toward the floor at the time of Deputy Ayala's first shot, the district court

44

reasonably concluded that this did not alter the court's own assessment of the body-camera and photographic evidence it had already examined for itself. ROA.1206, 1552. In short, the district court permissibly determined that Appellants had not presented newly discovered evidence of dispositive importance, but only evidence available before judgment that would have not changed the outcome.

## CONCLUSION

The Court should affirm the district court's judgment in full, including its order granting summary judgment and its order denying Appellants' Rule 59(e) motion, and award Appellees all relief to which they are entitled.

Respectfully submitted,

/s/ **Ricardo Pumarejo Jr.**

Ricardo Pumarejo Jr.
PUMAREJO LAW
1606 W. 42nd Street
Austin, Texas 78756
512.731.7869
ricardo@pumarejolaw.com
*Counsel for Appellees*

## CERTIFICATE OF SERVICE

I certify that on April 6, 2026, I electronically filed the foregoing instrument with the Clerk of Court by using the CM/ECF system which will send an electronic notice to all attorneys of record.

/s/ **Ricardo Pumarejo Jr.**

Ricardo Pumarejo Jr.

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of FED. R. APP. P. 28.1(e) because, excluding parts of the document exempted by FED. R. APP. P. 32(f), this document contains 8,085 words.

2.    This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionately spaced typeface using the most current version of Microsoft Word for Microsoft 365.

/s/ **_Ricardo Pumarejo Jr._**

Ricardo Pumarejo Jr.